UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Allen T. Belton

     v.                                  Civil No. 04-cv-270
                                         Opinion No. 2008 DNH 070
Larry Blaisdell, Acting Warden,
Northern Correctional Facility,
New Hampshire State Prison

**O R D E R**

The pro se petitioner, Allen T. Belton, seeks habeas corpus relief from his state conviction for robbery, claiming ineffective assistance of counsel and other constitutional infirmities attendant to those proceedings. After reviewing the petition, the magistrate judge recommended that Belton be allowed to proceed on 12 of the 14 claims identified in the petition.

The respondent, the acting Warden of the Northern Correctional Facility of the New Hampshire State Prison ("the Warden"), has since moved for summary judgment on a number of Belton's claims on the grounds that (1) they are procedurally defaulted because he failed to raise them in his direct appeal from his conviction and (2) they are without merit in any event. Belton objects, arguing that no procedural default applies but, even if it does, it is excused by the doctrines of cause and prejudice and actual innocence. He also argues that his claims support habeas relief.

This court has jurisdiction over Belton's petition under 42 U.S.C. § 1331 (federal question) and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") in particular.  See 28 U.S.C. § 2254(a) (habeas relief for state prisoners).  For the reasons stated below, the court grants the Warden's motion for summary judgment, except as to claims 2B-2J of Belton's ineffective assistance of counsel claim.

**BACKGROUND**

Belton was convicted by a jury in the New Hampshire Superior Court of robbing a bank.  He was sentenced to a prison term of 10 to 20 years.  Before trial, Belton filed motions to suppress the confession he allegedly gave on the day following the robbery, as well as other statements and physical evidence previously obtained by the police.  After an evidentiary hearing, the superior court suppressed certain statements and evidence, but not the confession.  New Hampshire v. Belton, No. 01-455, slip op. at 16-17 (N.H. Super. Ct. Nov. 9, 2001) ("Suppression Order").[1]  Belton appealed his conviction to the New Hampshire Supreme Court, which affirmed.  New Hampshire v. Belton, 150 N.H. 741 (2004) ("Direct Appeal Opinion").

---

[1]  The superior court later amended its decision on the motions to suppress in part.  New Hamphire v. Belton, No. 01-455 (N.H. Super. Ct. Sept. 27, 2002) ("Am. Suppression Order").

Under AEDPA, 28 U.S.C. § 2254(e)(1), this court must accept the facts found by the state courts unless Belton can demonstrate otherwise by clear and convincing evidence. McCambridge v. Hall, 303 F.3d 24, 25 (1st Cir. 2002) (en banc). Because he has not satisfied this burden, as discussed infra, this court surmises the relevant facts from the written order of the superior court denying Belton's motion to suppress and the opinion by the state supreme court affirming his conviction, supplementing with facts gleaned from the state court record where necessary. See id.

The First Essex National Bank in Salem, New Hampshire was robbed at around 9 a.m. on November 14, 2000, by a perpetrator who claimed he had a gun and threatened to shoot the bank's employees. Direct Appeal Opinion, 150 N.H. at 742. Witnesses described the robber to police as a dark-skinned male wearing white sneakers, a jogging suit, a baseball cap, and a nylon mask, and said he had run in the direction of bordering Methuen, Massachusetts. Suppression Order at 3. Believing that Belton fit this description, a police officer--previously acquainted with both Belton's appearance and his criminal record--headed to Belton's Methuen residence. Id. When the officer arrived there, he encountered Belton standing in the yard, and handcuffed him. Id. at 4. The officer then began questioning Belton about his whereabouts earlier that morning. Id.

3

After the arrival of another officer, Belton was informed of the robbery, but denied any involvement.  Id.  He also allowed the police to search his home, where they seized a pair of white sneakers.  Id.  As additional law enforcement personnel appeared, the police continued to question Belton, who generally continued to proclaim his innocence.  Id.  Belton then took the officers up on their suggestion that he accompany them to the station, where he was taken in the back of a police cruiser, still handcuffed. Id.  In the meantime, a police dog picked up a scent along railroad tracks near where the fleeing suspect had been seen by witnesses.  The dog followed the scent to a wooded area--where a hat, jacket, and gloves matching the robber's were found--then to the bank and eventually to Belton's home.

Belton's handcuffs were removed after his arrival at the station, when he was placed in an interview room.  Two officers proceeded to question him about his whereabouts during the robbery, in particular his claim that he had been out jogging that morning.  After telling Belton that the robber's clothing had been discovered, the officers asked him whether he would be willing to try it on--Belton declined--and informed him of their intention to ask his co-workers whether they had ever seen him wearing it.  Expressing concern that he was incriminating himself, Belton asked whether he was free to go; the officers confirmed that he was.  Suppression Order at 4.  Belton, who had

4

not been advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), was then permitted to leave.  Suppression Order at 5.

Some fifteen minutes later, however, Belton was again taken into custody, by way of a warrantless arrest based on evidence independent of the preceding search and seizure, viz., the track followed by the police dog.  Id.  He appeared before a judge in Massachusetts the next morning, when he was arraigned on a charge of being a fugitive from justice, i.e., fleeing into Massachusetts after the robbery in New Hampshire.  Id. at 10. With the advice of an attorney, Belton waived extradition to New Hampshire.  Direct Appeal Opinion, 150 N.H. at 748-49.

While awaiting custodial transportation from the court to the Salem Police Department, Belton said he wanted to speak with the detective he had been talking to the previous night, Mark Sambataro.  Suppression Order at 10-11.  Sambataro, apprised of this request, visited Belton after he had been placed in a holding cell at the department.  Id. at 13-14.  Using a written form, id. at 5, Sambataro then "carefully reviewed" the Miranda warnings with Belton, who indicated his understanding and waiver of those rights by initialing and signing the form.  Id. at 11.

Belton inquired about the evidence the police had linking him to the robbery.  Id.  In response, Sambataro claimed-- falsely--that clothing discovered near the crime scene contained

DNA matching Belton's.[2]  Id.  Sambataro added that a number of
witnesses had seen Belton at different points along his escape
from the bank.  But, Sambataro said, the money had yet to be
discovered.  Belton challenged this last point, arguing that
if the police had found his clothing, then they had to have found
the money as well.  After a cigarette break, Belton announced
that he was ready to talk about where he hid the money.  He
promptly confessed to taking the money from the bank before
discarding it behind a nearby store when the accompanying dye
pack exploded.  Belton also asked Sambataro about making a deal;
the detective replied that he would talk to the prosecutor on
Belton's behalf.  Sambataro made notes of this conversation, but,
in accordance with his standard practice, destroyed them when he
incorporated them into his police report on the incident.

After confessing, Belton, at his own suggestion, accompanied
the police on a trip in a cruiser to retrieve the money.  Id.
Though it was never recovered, Belton made additional inculpatory
statements during the trip, as well as an offer to plead guilty
on condition that he serve the sentence in federal (as opposed to
state) prison.  Id. at 11-12.

Belton appeared to get that chance when he was indicted in
this court on one count of federal bank robbery in violation of
18 U.S.C. § 2113(a).  United States v. Belton, No. 01-00009 (Feb.

---

[2]  In truth, no DNA testing had yet been performed.

7, 2001).  But the United States Attorney soon filed a motion to dismiss the indictment without prejudice, which was granted.  <u>Id.</u> In a call to defense counsel, the responsible Assistant United States Attorney explained that "he was dismissing the case because the defendant was cuffed at his home without probable cause and that the evidence that was derived from that arrest tainted the rest of the case."  Memo from Bjorn Lange, Federal Defender, to file (Feb. 27, 2001).  Belton was nevertheless subsequently indicted by a state grand jury on one count of robbery in violation of N.H. Rev. Stat. Ann. § 636:1.[3]

Belton, as previously noted, filed pre-trial motions to suppress the confession, in addition to the statements he made to police and the sneakers seized from his home on the preceding day, on the grounds that (1) they were the fruits of his illegal arrest on that day and (2) the confession and statements were obtained in violation of <u>Miranda</u>.  The superior court ruled that, while the policeman who first encountered Belton at his home had acted out of a legitimate concern for officer safety in handcuffing Belton, that concern dissipated after other officers had arrived on the scene and Belton was found to be unarmed, transforming the continued use of restraints into an unlawful

---

[3]  Before the federal indictment came down, Belton had been arraigned on a complaint charging robbery in state district court, which was eventually dismissed by writ of *nolle prosequi* when he was indicted by the state grand jury.

arrest and coercing the consent Belton gave to a search of his home.[4] <u>Suppression Order</u> at 7-10. The superior court also ruled, however, that Belton had validly waived his <u>Miranda</u> rights before confessing to Sambataro the next day, <u>id.</u> at 14, and that the confession had been voluntarily given despite the unlawful arrest the day before, <u>id.</u> at 15-16.

At the suppression hearing, the superior court heard testimony from several police officers, including John Joy, who had handled the police dog during its efforts to track the robber. On cross-examination, Joy was asked about the accuracy of a statement in one of his reports that, prior to handling the dog, he never communicated with any other police officer about the suspect's possible escape route; Joy had testified on direct examination to his conversations on that subject with fellow officers. Joy initially stood by the accuracy of his report, but eventually acknowledged that, before he started the dog tracking efforts, fellow officers had given him some information about where the suspect had been spotted. Belton claims that Joy thus perjured himself. Belton also alleges that, during the hearing,

---

[4]   The superior court later determined that Belton had been in custody for the entirety of his interaction with police on the day of the robbery and therefore suppressed all the statements he made during that time because he had not been given <u>Miranda</u> warnings. <u>Am. Suppression Order</u> at 5-6.

the superior court judge "would periodically fall asleep" and that he made offensive comments about Belton's mother.[5]

The case against Belton proceeded to trial, with the state introducing, *inter alia*, Belton's confession, an account of the scent trail followed by the police dog, and the clothing discovered in the woods along that route.  The clothing included a mask, cut from a pair of nylons, which had been found in the pocket of the jacket.  A forensic analyst called by the state testified that Belton could not be excluded as the source of DNA found on the mask.  <u>Direct Appeal Opinion</u>, 150 N.H. at 742-43.

The state also offered testimony that two witnesses to the robber's flight from the bank, George Arsenault and George Coker, had selected Belton's photograph as that of the robber when shown a photographic array.  <u>Id.</u> at 742.  Though Arsenault had told law enforcement personnel during their investigation of the robbery that he is color blind, he testified as to the color of the robber's jacket without mentioning this disability, and the state

---

[5]   The comments at issue occurred during the discussion of Belton's request to visit his mother, who had just suffered a massive stroke, presenting her family with a dilemma over whether to keep her on life support.  In considering this request, the court commented to defense counsel that, if Belton's mother's "condition is as bad as you say it is, then he would not be able to communicate with her anyway," and that he could remotely participate in the family's decision over her care.  After defense counsel clarified that Belton just "want[ed] to see his mom before she dies," however, the court expressed a willingness to "review [Belton's request] with the Sheriff and see what I can do."  It appears that the request was ultimately denied.

did not bring it up,[6] which Belton characterizes as akin to
allowing perjured testimony.

Another witness to the flight, Christine Spignesi, testified
that she had picked "[a]t least one or two" photographs from the
array which she thought were similar to the robber.  Id. at 745.
Neither side asked her, however, to point out those photographs
in court.  Defense counsel did not learn that Spignesi had been
shown the array until their investigator spoke to her on,
literally, the eve of trial; this fact had been omitted from the
pre-trial discovery provided by the state.  Id. at 746.
Characterizing this omission as a violation of New Hampshire
Superior Court Rule 98, governing discovery in criminal cases,
and invoking Brady v. Maryland, 373 U.S. 83 (1963), Belton asked
the superior court to sanction the state by excluding all of its
photographic identification evidence--from Spignesi as well as
the other witnesses.  Direct Appeal Opinion, 150 N.H. at 746.
The superior court refused, reasoning that Spignesi had in fact
testified she was unable to identify the robber from the array,
so that any violation had in essence already been remedied.  Id.

The state also presented testimony from a number of police
officers, including Sambataro and Roger Beaudet, which Belton
claims was intentionally false in light of their prior statements

_____

    [6]  As Belton acknowledges, defense counsel had received,
before trial, information that Arsenault was color blind.  Br.
Supp. Pet. Writ at 153.

at the suppression hearing.  Sambataro testified at trial that,
following Belton's initial arraignment in state district court,
see note 3, supra, an agent from the Federal Bureau of
Investigation had arrived at the Salem Police Department to be
introduced to Belton, who was being held there.  When asked
whether the agent "was going to try to talk to" Belton, Sambataro
answered, "Try to talk to him?  She ended up giving him a
business card, if that's what you're asking."  Belton contrasts
this with Sambataro's testimony at the suppression hearing, where
he denied that he and the agent had tried to interview Belton,
but acknowledged that the agent "may have" done so on her own.

    Beaudet was asked at the suppression hearing, "Did you
realize that the Lawrence Eagle Tribune had taken a picture of
Mr. Belton in custody?"  After Beaudet replied, "I don't know,"
he was shown just such a photograph, which had appeared in the
paper before he showed the photographic array to a number of
witnesses.  At trial, after Beaudet stated that he had not asked
the witnesses shown the array whether they had seen Belton's
picture in the paper, the following exchange took place between
Beaudet and defense counsel:

> MS. COOPER:    Okay.  But you were aware that Mr.
>                Belton's photograph was in the
>                paper --
>
> MR. BEAUDET:   Yes.
>
> MS. COOPER:    --the day after the robbery.  Would
>                you like to see it?

> MR. BEAUDET:   Yeah.   November 15.

> MS. COOPER:   Okay.

Belton characterizes this testimony as false in light of Beaudet's statement at the suppression hearing that he did not know whether the newspaper had photographed Belton.

Another officer who testified at trial, Ronald Peddle, related an exchange with Arthur Guptil, a man Peddle encountered while chasing the suspect along the railroad tracks immediately following the robbery.  According to Peddle, Guptil "said he'd just seen a black man running toward –– further into Methuen . . . .  [H]e was wearing a blue jacket, white sneakers, and blue jeans."  Belton now challenges this testimony as a violation of the Confrontation Clause of the Sixth Amendment.

Belton, for his part, introduced testimony from several members of a crew working along the street in front of his house on the morning of the robbery, who said he was outside giving them soda and cigarettes during that time.  Defense counsel argued in summation that this behavior was inconsistent with Belton's guilt, proposing that he would have remained hidden in his house if he had in reality just robbed a bank.  In rebuttal, the prosecutor argued for a different inference:  "He came out of that house and he's handing out cigarettes. . . . That's a guilty person.  He's creating an alibi.  He wants as many people to see him . . . and he's out there giving out cigarettes and Coke."

Belton now challenges this statement as improper because he had not, in fact, asserted an alibi defense.

The jury found Belton guilty, and he appealed his conviction to the New Hampshire Supreme Court.[7]  The appellate brief prepared by counsel was limited to three claims:  (A) the DNA evidence purportedly linking Belton to the mask was improperly admitted without proper explanatory testimony; (B) as a sanction for failing to disclose before trial that Spignesi had been unable to identify the robber when shown the photographic array, the state should have been barred from introducing any array evidence and (C) Belton's confession should have been excluded as the fruit of his unlawful arrest and the illegal search of his home.  Belton also filed a supplemental pro se brief arguing that (D) evidence that the police dog had tracked the robber to Belton's home was admitted without the foundation required under New Hampshire law; (E) his unlawful arrest had begun when he was handcuffed by the officer who first encountered him outside his home; and (F) the state had not properly shown the chain of custody for the mask.

In affirming Belton's conviction, the New Hampshire Supreme Court denied all of these claims.  Direct Appeal Opinion, 150

---

[7] Belton now claims that the superior court judge entered the jury room during deliberations and disclosed that Belton had prior convictions for robbery.  As explained infra, this court rejects that claim.

N.H. at 742.  The court ruled that, given the insufficient indication that the mask contained a "mixed sample" of DNA from multiple persons, no additional explanatory testimony was necessary.  Id. at 744.  The court also ruled that the trial judge had properly declined to exclude "all testimony concerning photographic identifications" as a sanction for the state's alleged failure to disclose Spignesi's inability to select the robber from the photo array.  Id. at 746-47.  The court deemed this sanction "unreasonable" and ruled that, in any event, the alleged discovery violation had not prejudiced Belton because Spignesi had admitted as much in her trial testimony.  Id.  The court also rejected Belton's claim that his confession should have been excluded.  Id. at 749.  Finally, the court announced that it had considered Belton's pro se supplemental brief but "conclude[d] that the issues raised in it have no merit and warrant no further discussion."  Id. at 750.

Belton then filed his instant pro se petition for a writ of habeas corpus in this court, together with a motion to stay the habeas proceedings so that he could pursue further relief in the state courts.[8]  The motion was granted.  Belton, still proceeding pro se, then lodged several post-conviction motions in the

---

[8]  Belton also filed a pro se certiorari petition with the United States Supreme Court, which was denied on December 26, 2004.  Belton v. New Hampshire, 543 U.S. 1028 (2004).

superior court, including a motion for a new trial and a
subsequent motion to amend it.

In support of this relief, Belton asserted a number of
claims:[9]  (1) he had not effectively waived his Miranda rights
before confessing and, moreover, that the confession was procured
in violation of his Sixth Amendment right to counsel and Fifth
and Fourteenth Amendment rights to due process; (2) he was denied
effective assistance of counsel when his attorneys made a number
of errors at various stages of the proceedings against him;
(3) the use of the DNA evidence at his trial offended due
process; (5) the use of the dog tracking evidence at his trial
offended due process; (7) the police used unduly suggestive
pretrial identification procedures; (8) the authorities had
denied Belton his right to equal protection by electing to pursue
their case against him on the basis of his race; (9) his
conviction on the state robbery charge after the pre-trial
dismissal of the federal charge for the same crime violated
principles of double jeopardy, res judicata, and full faith and
credit; (10) the superior court judge had engaged in a variety of

---

[9]  To avoid confusion, the court will number these claims in
a manner consistent with the magistrate judge's Report and
Recommendation in this matter, which was adopted without timely
objection from either party.  See infra.  To the extent the court
describes any of the claims here in language different from that
in the Report and Recommendation, that difference is not intended
to suggest any disagreement with the magistrate judge's
construction of the claims in Belton's petition.

misconduct; (11) the prosecutor had engaged in a variety of misconduct; (12) Belton had been denied his right to confront Guptil when Peddle testified to his out-of-court statement; (13) his confession had been the product of his intial illegal arrest; and (14) he had been re-arrested without probable cause.

In response to Belton's motion for a new trial, the state filed a two-page objection asking for additional "time to review and accurately address the defendant's multiple arguments for relief."[10]   The objection also noted that "[i]t appears that the issues addressed by the defendant's motion have already been litigated both prior to and during trial and addressed in the [New Hampshire] Supreme Court opinion" rejecting Belton's appeal. It seems that no action was taken on the state's request for more time, and that the state never filed a substantive objection to Belton's motions, despite his subsequent request that the court compel one.  Nor was any evidentiary hearing ever held.  The clerk of the superior court simply notified the parties, some five months after the filing of the post-conviction motions, that all of them had been denied.  Belton then filed a motion for reconsideration of the denials, complaining that they had been issued "without ruling on the merits of his claims, nor without

---

[10] The state filed a similar one-page objection to Belton's motion to amend his new trial motion.

16

[*sic*] a hearing as to the disputed facts."  The superior court denied the motion to reconsider by written order.

The order explained that the superior court had not held a hearing on Belton's original motion for new trial because it "contained nothing more than the same allegations of this Court's improper rulings that were the subject of [his] appeal." <u>New Hampshire v. Belton</u>, No. 01-S-455, slip op. at 1 (Dec. 12, 2005) ("<u>New Trial Order</u>").  The court similarly described Belton's motion to amend his new trial motion as "little more than a rehashing of all of the pretrial and trial evidentiary issues which had been the subject of the defendant's Supreme Court appeal," though it identified "added" claims that police witnesses had perjured themselves and that Belton had received ineffective assistance from his first defense attorney.  <u>Id.</u> at 2.  The court, however, explained that it had "found nothing in the defendant's pleading that would warrant the scheduling [of] a hearing on these issues."  <u>Id.</u>  Finally, the trial judge "elected to address" the claim that he had improperly communicated with the jurors during the trial in an ex parte fashion, calling "these allegations . . . new . . . and outside of the scope of the evidentiary issues that have previously been reviewed by the Supreme Court."  <u>Id.</u>  But the court rejected this claim, insisting that its only ex parte interaction with the jury occurred after the verdict had already been returned.  <u>Id.</u> at 4.

17

Belton filed a notice of discretionary appeal of the denial
of his post-conviction motions with the New Hampshire Supreme
Court, raising, for all intents and purposes, all of the same
claims asserted in the motions themselves.  The New Hampshire
Supreme Court declined review.  <u>See</u> N.H. Supr. Ct. R. 7(1)(B).
Belton, claiming to have thus exhausted his state court remedies,
then asked this court to reopen the proceedings on his habeas
petition, which had been administratively closed during the stay.

After reopening, the magistrate judge conducted an initial
review of Belton's petition, identifying 14 separate claims
"which were unsuccessfully presented to the New Hampshire state
courts, including the New Hampshire Supreme Court."  Rept. & Rec.
at 5 (footnote omitted).  These claims are:

1.   The conviction was obtained in violation of Belton's
     Fifth Amendment right against self-incrimination when
     his coerced confession was used against him at trial;

2.   Belton's Sixth Amendment right to the effective
     assistance of counsel was violated [through a number of
     alleged errors by his pre-trial, trial, and appellate
     attorneys];

3.   The conviction was obtained in violation of Belton's
     Fourteenth Amendment due process rights and Sixth
     Amendment confrontation right by the introduction of
     DNA evidence at trial that was admitted without
     adequate statistical information to assist the jury in
     interpreting the testimony;

4.   The conviction was obtained in violation of Belton's
     Fourteenth Amendment due process rights when the trial
     court allowed the prosecution to admit a jacket and
     mask in evidence, and allowed forensic evidence derived
     from the property to be admitted, despite incomplete
     chain of custody evidence;

18

5.   The conviction was obtained in violation of Belton's Fourteenth Amendment due process rights when the trial court allowed dog track evidence to be introduced at trial without the prosecution establishing a proper evidentiary foundation for the evidence;

6.   The conviction was obtained in violation of Belton's Fourteenth Amendment due process rights and Sixth Amendment confrontation right when the prosecution failed to disclose evidence to Belton that a witness was unable to choose Belton's picture out of a photographic array, a fact that should have resulted in exclusion of all of the photographic identification evidence;

7.   The conviction violated Belton's Fourteenth Amendment due process rights and his Sixth Amendment confrontation right due to the admission of evidence obtained after an unnecessarily suggestive photographic identification process was utilized;

8.   The conviction violated Belton's Fourteenth Amendment right to equal protection of the laws when prosecutorial and investigatory decisions were made on the basis of race;

9.   Belton's conviction violates his Fifth Amendment right not to be twice put in jeopardy and his Fourteenth Amendment right to enjoy the protection of a federal judgment because the state prosecuted him after the federal indictment against him was dismissed;

10.  Belton's conviction violates his Sixth Amendment right to a fair and impartial trial when the trial judge engaged in the following acts of misconduct:

   A.   The trial judge talked to the jurors and provided them with damaging information about Belton prior to the verdict;

   B.   The trial judge slept during the proceedings against Belton;

   C.   The trial judge made offensive comments about Belton's mother that revealed his bias against Belton;

11. The conviction was obtained in violation of Belton's Fourteenth Amendment due process rights when the prosecution engaged in the following acts of misconduct:

    A. The prosecution knowingly presented perjured police testimony to the jury;

    B. The prosecution admitted prejudicial evidence about a dog track without proper foundation;

    C. The prosecution offered the testimony of a color-blind witness without providing proper exculpatory information regarding the witness to the petitioner;

    D. The prosecution made improper comments about Belton's defense strategy during his summation;

    E. The prosecution engaged in vindictive prosecution by increasing the severity of the charges when Belton exercised his constitutional rights in the defense of his case;

12. The conviction was obtained in violation of Belton's Sixth Amendment right to confrontation when a police officer testified to improper hearsay statements made by a non-testifying declarant;

13. The conviction was obtained in violation of Belton's Fourth Amendment rights because statements and evidence obtained after the improper seizure of his person on November 14, 2001 were used against him at trial;

14. The conviction was obtained in violation of Belton's Fourth Amendment rights because improperly obtained evidence was admitted pursuant to the trial court's erroneous ruling that the police had reasonable and articulable suspicion that Belton had committed a crime at the time they seized Belton's person; probable cause to arrest, which was needed to properly make such a seizure, did not exist.

Id. at 5-8 (capitalization corrected).  The magistrate judge

recommended the dismissal of claims 13 and 14 as untenable

grounds for habeas relief under Stone v. Powell, 428 U.S. 465

(1976), but further recommended that the Warden be required to respond to claims 1-12.  Id. at 9-11.  This court subsequently adopted the recommendations without objection from either party.

The Warden then moved for summary judgment on all of Belton's claims.  The Warden argued that claims 1, 3-9, 10B-10C, 11B-11F, and 12 were procedurally barred because Belton had not raised them in his direct appeal from his conviction and that, aside from this asserted bar, neither these claims nor any of Belton's other theories met the applicable standard for federal habeas relief on the merits.  At a subsequent hearing, this court granted the Warden's motion as to claims 3-5, 10A, and 11B, and part of claim 2, concluding that there was no genuine issue of material fact as to whether they could support habeas relief. The court denied the motion, however, as to the remainder of Belton's ineffective assistance of counsel claim, ruling that an evidentiary hearing was necessary to assess it.[11]

## ANALYSIS

At the hearing, this court put off any determination of the procedural bar issue, ordering the Warden to file a supplemental motion for summary judgment addressing it more clearly.  The

---

[11]   The court also announced that it would appoint counsel to Belton for the purpose of conducting this hearing, and that Belton had waived the attorney-client privilege by raising the ineffective assistance claims.

Warden did so, reiterating his argument that the allegedly barred claims also do not support federal habeas relief on their merits. Belton objects on both grounds.

I.   **Procedural Default**

    A.   **Applicable legal standard**

"The procedural default doctrine . . . 'refers to a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions.'" Dretke v. Haley, 541 U.S. 386, 392 (2004) (quoting McCleskey v. Zant, 499 U.S. 467, 489 (1991)). "A corollary to the habeas statute's exhaustion requirement," id., the doctrine "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." Coleman v. Thompson, 501 U.S. 722, 732 (1991). "[T]he doctrine has its roots in the general principle that federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." Dretke, 541 U.S. at 392 (citing Wainwright v. Sykes, 433 U.S. 72, 81 (1977); Brown v. Allen, 344 U.S. 443, 486–487 (1953).

"[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." Coleman, 501 U.S. at 732. But so

long as "the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition."  Id. at 735 (footnote omitted).  In such a case, where the state court bases its decision on the merits of the federal claim rather than on its own procedural rules, "a federal court implies no disrespect for the State by entertaining the claim."  County Ct. of Ulster County v. Allen, 442 U.S. 140, 154 (1979) (footnote omitted).  Furthermore, "only a firmly established and regularly followed state practice may be interposed by a State to prevent subsequent review" of a federal claim in the federal courts; "[n]ovelty in procedural requirements" at the state level will not serve to defeat federal habeas jurisdiction.  Ford v. Georgia, 498 U.S. 411, 423-24 (1991) (internal quotation marks omitted).

Although "a federal court may, in its discretion, raise procedural default sua sponte," McCambridge v. Hall, 266 F.3d 12, 29 (1st Cir. 2001), aff'd on reh'g en banc, 303 F.3d 24 (1st Cir. 2002), "[p]rocedural default is normally a defense that the State is obligated to raise."  Id. at 28-29 (citing Trest v. Cain, 522 U.S. 87, 88 (1997)).  Thus, the Warden "bears the burden not only of asserting that a default occurred, but also of persuading the

23

court that the factual and legal prerequisites of a default are present." Pike v. Guarino, 492 F.3d 61, 73 (1st Cir.) (internal quotation marks and ellipse omitted), cert. denied sub nom. Pike v. Bissonnette, 128 S. Ct. 716 (2007).

### B.   The respondent's procedural default claim

Here, the Warden argues that the superior court denied Belton's motions for post-conviction relief on the basis of "firmly established and regularly followed procedural rules" preventing a defendant "from collaterally challenging or 'rehashing' any claims that were not preserved at trial, and any claims that were either not raised, or raised in a different form, in his direct appeal."[12]  Putting aside the question of whether these rules would have been an "adequate" basis for denying Belton's federal claims, they were plainly not the reason for the court's decision, and so cannot serve as an "independent" state-law ground preventing federal habeas review.

The superior court's order stated simply that Belton's motion for a new trial "contained nothing more than the same

---

[12]  Though the last state court to which Belton presented his federal claims was the New Hampshire Supreme Court when it declined to hear his discretionary appeal from the denial of his post-conviction motions, "a discretionary denial of review cannot lift a pre-existing procedural bar." Ylst v. Nunnemaker, 501 U.S. 797, 802 n.2 (1991).  Thus, this court must look to the superior court's decision on the post-conviction motions to see whether it imposed a procedural default in the first instance.

allegations of this Court's improper rulings that were the
subject of his appeal" and that his subsequent motion to amend
"contained little more than a rehashing of all of the pretrial
and trial evidentiary issues which had been the subject of the
defendant's Supreme Court appeal."[13]  New Trial Order at 1-2.
These statements do not invoke a prohibition on using collateral
review to litigate claims anew, but rather re-litigating claims
that were already made on appeal.[14]

The Supreme Court has instructed that if "a state decision
rests upon a prohibition against further state review"--in
particular, a rule "preventing the relitigation on state habeas
of claims raised on direct appeal"--then "its effect on the
availability of federal habeas is nil," because it "neither rests

---

[13]  The superior court also indicated that it "had found
nothing" in the motion to amend "that would warrant the
scheduling of a hearing" on Belton's claims of police perjury and
constitutionally deficient representation by his first attorney,
and proceeded to reject the claim that the trial judge had
improperly communicated with the jury.  New Trial Order at 2-4.
The Warden accordingly does not question that those claims were
decided on the merits, rather than rejected on the basis of a
state procedural rule.  This court's procedural default analysis,
then, does not apply to these claims.

[14]  This court disagrees with the Warden that the superior
court's characterization of Belton's motion to amend as "a
rehashing" raises a rule against collateral relief for claims
that were not presented on appeal, as well as claims that were.
To "rehash" is to "present or use again in another form without
real change or improvement in substance:  to restate (as old
arguments) in new language."  Webster's Third New International
Dictionary of the English Language (Unabridged) 1914 (Philip
Babcock Grove, ed., 2002).  The term therefore does not fairly
embrace the construction the Warden suggests.

upon procedural default nor lifts a pre-existing procedural
default." Ylst, 501 U.S. at 804 n.3.  Such a decision does not
reject claims because they were not presented earlier, but for
precisely the opposite reason that they _were_ presented earlier,
and therefore does not impose "a procedural bar in the
traditional sense." Bennett v. Whitley, 41 F.3d 1581, 1583 (5th
Cir. 1994).  The superior court's order rejecting certain claims
in Belton's post-conviction motions as "the same" as or "a
rehashing" of his arguments on direct appeal, then, does not bar
this court from considering those claims on habeas review.  Id.

The problem here is that, with due respect to the trial
court, both Belton and the Warden acknowledge that a number of
the grounds for his post-conviction motions had _not_ in fact been
raised in his direct appeal.  Thus, the superior court could not
have correctly relied on a rule against re-litigating appellate
claims on collateral review to dispose of those motions in their
entirety.  The Warden argues that this situation makes the
superior court's order "ambiguous," which, the Warden posits,
requires this court to consider "the nature of the disposition
. . . in light of the surrounding circumstances, including the
clearly established and regularly followed rules of the New
Hampshire Supreme Court."  Because these rules would have barred
Belton from post-conviction relief for claims he did not raise at
trial or on direct appeal, the Warden continues, this court

should infer that the superior court denied his post-trial motions on those grounds.

The Supreme Court has observed that "[i]t is not always easy for a federal court to apply the independent and adequate state ground doctrine" because "[s]tate court opinions will, at times, discuss federal questions at length and mention a state law basis for decision only briefly," thus making it "difficult to determine if the state law discussion is truly an independent basis for decision or merely a passing reference." Coleman, 501 U.S. at 732. Here, however, the superior court announced that it had denied Belton's new trial motions because they largely duplicated his arguments on direct appeal, then proceeded to reject what it perceived as his new claims on the merits, without even hinting at the other procedural missteps the Warden now identifies. The superior court's order therefore lacks the hallmarks of an "ambiguous" state court opinion as recognized in Coleman: references to state procedural bars among other substantive reasons for denying the claims at issue.

In the absence of any such reference in the text of the order itself, this court cannot simply assume that the superior court relied on the procedural bars now asserted, even if they are the "established and regularly followed rules of the New Hampshire Supreme Court." This approach would essentially put the federal habeas court in the position of applying state

27

procedural rules in the first instance,[15] which does nothing to
serve--and, in fact, may frustrate--the principal interest of the
procedural default doctrine in ensuring that federal courts
respect their state counterparts' application of their own law.
See Ulster County, 442 U.S. at 154; see also Koerner v. Grigas,
328 F.3d 1039, 1052 (9th Cir. 2003) (declining to "usurp the role
of the state courts and determine which state law rules apply" as
potential bars to habeas petitioner's claims).  Indeed, "[t]he
mere existence of a basis for a state procedural bar does not
deprive [a federal] Court of jurisdiction; the state court must
actually have relied on the procedural bar as an independent
basis for its disposition of the case."  Caldwell v. Mississippi,
472 U.S. 320, 327 (1985).  There is no indication that the
superior court did so here, and thus no procedural bar to this
court's consideration of Belton's claims on habeas review.

The Warden's argument to the contrary depends heavily on the
similar absence of any indication that the superior court relied
on federal law in disposing of the claims at issue.  As a result,

---

[15]  A federal court may do so "[w]here a federal habeas
petitioner raises a claim which has never been presented in any
state forum," because "no state court was ever given the
opportunity to pass on either the procedural posture or the
merits of the constitutional claim."  Harris v. Reed, 489 U.S.
255, 269 (1989) (O'Connor, J., concurring); see also Teague v.
Lane, 489 U.S. 288, 297-98 (1989).  The question here, however,
is not whether Belton ever presented the claims at issue to the
state court--it is clear that he did in his post-conviction
motions--but whether he did so in a procedurally deficient way
that triggered denial.

the Warden rightly points out, this court cannot simply apply the presumption that because the state court did not "clearly and expressly state[] that its judgment rests on a state procedural bar," it rested on federal law, thus enabling federal habeas review.  Harris, 489 U.S. at 263 (internal quotation marks omitted).  For this presumption to apply, "the decision of the last state court to which the petitioner presented his federal claims must fairly appear to rest primarily on federal law or to be interwoven with federal law," Coleman, 501 U.S. at 735; otherwise, "it is simply not true that the most reasonable explanation is that the state judgment rested on federal grounds," which is the predicate for the "Harris presumption" in the first place, id. at 737.

The Warden, however, advances the converse proposition: unless the state court clearly and expressly relies on federal law in rejecting the petitioner's claims, it should be presumed that the rejection depends on available state procedural grounds.[16]  But this is not what Coleman says.  The decision did

_____

[16] In a variant of this argument, the Warden relies on the Second Circuit's teaching that "federal habeas courts should distinguish between two mutually exclusive categories of state-court decisions disposing of a federal claim"--those "that fairly appear either to rest primarily on federal law or to be interwoven with federal law" and those "that fairly appear to rest primarily on state procedural law."  Jimenez v. Walker, 458 F.3d 130, 138 (2d Cir. 2006) (emphasis added), cert. denied sub nom. Jimenez v. Graham, 127 S. Ct. 976 (2007).  Because the superior court's order does not fit the former category, the Warden suggests, it must fit the latter.  But the Second

not purport to overrule the principle that "the mere fact that a
federal claimant failed to abide by a state procedural rule does
not, in and of itself, prevent [a federal] Court from reaching
the federal claim." Harris, 489 U.S. at 261.  As one court has
observed, "Coleman gives little guidance on the proper approach
to state court decisions that do not rely on federal law grounds,
but for which the applicable state law ground is ambiguous or
unclear."  Koerner, 328 F.3d at 1051.  Coleman holds only that a
federal court cannot simply presume that such a decision did not
depend on state law.  See id.  A court therefore remains free to
reach that conclusion by other means, such as, in this case, the
state court's failure to mention state procedural default rules
at all in rejecting the claims.

It is true that some other courts have read Coleman to
endorse a broader rule:  where the Harris presumption does not
apply, i.e., where the state-court decision does not fairly
appear to rest primarily on federal law or to be interwoven with
federal law, "federal habeas courts should consider the
circumstances surrounding the entry of the state order" to
discern whether it relied on state procedural grounds.  Wilson v.

---

Circuit's dichotomy does not account for a state-court decision
that disposes of the petitioner's collaterally presented federal
claims on the ground that they were already rejected on direct
appeal; such a decision, as the Supreme Court has held, is
neither a ruling on the merits nor a procedural default.  Ylst,
501 U.S. at 802 n.2.  Thus, whatever the merits of the Jimenez
dichotomy as a general matter, it has no application here.

Moore, 178 F.3d 266, 274 (4th Cir. 1999); see also Jimenez, 458
F.3d at 138-39; Koerner, 328 F.3d at 1054 (Beezer, J.,
dissenting).  These "surrounding circumstances" have generally
been defined to include "both the state court's awareness of a
procedural bar and the state court's practice when faced with
such a bar"--even when those circumstances are not reflected on
the face of the state court's opinion, which the federal habeas
court may "look[] behind" in its analysis.  Jimenez, 458 F.3d at
138-39;[17] see also Wilson, 178 F.3d at 274.  Taking this tack
here, the Warden argues, leads to the conclusion that the
superior court denied Belton's post-conviction motions for
procedural default, given New Hampshire's longstanding practice
of treating claims not properly presented on direct appeal as
"waived and immune from future review."[18]

---

[17] In Jimenez, the Second Circuit acknowledged that "the
practice of state courts" was "a fact that Coleman did not
examine" to decide whether the state court decision there was
premised on procedural default, but did not cite any other
Supreme Court authority for this approach.  458 F.3d at 139.
This court therefore expresses no view on whether this approach,
as a general matter, is consistent with Coleman, but simply
assumes that it is for the purpose of this motion.

[18] For purposes of its decision on this motion, this court
assumes that such a practice is in place.  But see Avery v.
Cunningham, 131 N.H. 138, 143 (1988) (holding that, when a party
has "both knowledge of [an] issue and an opportunity to raise it
properly . . . on direct appeal, but fail[s] to do so, he has
procedurally waived the issue for collateral review," but
nevertheless considering merits of particular ineffective
assistance of counsel claim omitted from direct appeal).

31

But those courts that have found procedural default by "looking behind" the state court's order do not appear to have relied solely on the existence of a state-court practice, as the Warden urges this court to do here.  Instead, those decisions generally depend on this circumstance in conjunction with the fact that the state had argued for dismissal of the petitioner's claim in the state court on the basis of procedural default.  See Wilson, 178 F.3d at 277-78; Quirama v. Michele, 983 F.2d 12, 13-14 (2d Cir. 1993); see also Ylst, 501 U.S. at 802 (observing that, in Coleman, the "surrounding circumstances (in particular the fact that the State had rested its argument entirely upon a procedural bar), indicated that the basis [of the state decision] was procedural default").  This reasoning has some force because, against the background of a consistent state-court practice to apply a procedural bar, "it is . . . reasonable to presume that silence [from the state court] in the face of arguments asserting a procedural bar indicate[] that the [decision] was on state procedural grounds."  Quirama, 983 F.2d at 14.

Here, in contrast, there were neither "arguments asserting a procedural bar" nor "silence" from the state court in response. The state did not ask the superior court to deny Belton's motions because they raised claims that were omitted from appeal, instead citing a rule that, as the Supreme Court has instructed, is not in the nature of a procedural bar:  "it appears that the issues

32

addressed . . . have already been litigated both prior to and
during trial and addressed in the [New Hampshire] Supreme Court
opinion."  It was this point--and only this point--that the
superior court seized upon in explaining its denial of the
motions, except insofar as it deemed certain of Belton's claims
"added" and thus considered them on the merits.

To read that decision as based on a rule against founding
collateral challenges on claims omitted from direct appeal, then,
is not to "look behind" the decision in the manner endorsed by
some courts, but to look completely past it to find a basis for
procedural default previously invoked by neither the state nor
the state court.  For the reasons already explained, such an
approach is inconsistent with Supreme Court precedent and at odds
with the principal purpose of the procedural bar doctrine to
respect state courts' application of their own rules of
procedural default.  The superior court did not apply any such
rule in rejecting Belton's claims.  Accordingly, there is no
procedural bar to their consideration on habeas review.[19]  <u>See
Harris</u>, 489 U.S. at 261-62.

---

[19] This court therefore need not reach Belton's cause and
prejudice and actual innocence arguments.

33

**II.  Absence of any genuine issue of material fact**

    **A.  Applicable legal standard**

      "In civil matters including habeas, evidentiary proceedings are appropriate only where the party bearing the burden of proof . . . starts with enough evidence to create a genuine issue of fact; otherwise summary judgment is proper." Bader v. Warden, N.H. State Prison, 488 F.3d 483, 488 (1st Cir. 2007).  Belton bears the burden of proof on all of his claims for habeas relief. See id.  Under AEDPA, a federal court cannot grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state decision (1) "was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

      By its terms, this deferential standard of review applies only to claims that were in fact "adjudicated on the merits" in the state courts.  "If the federal claim was never addressed by the state court, federal review is de novo." Pike, 492 F.3d at 67.  Even when the habeas court reviews the legal claim de novo, AEDPA imposes "a separate and exacting standard applicable to review of a state court's factual findings," id., which "shall be presumed to be correct" unless the petitioner carries his burden

to "rebut the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1).

### B.   Belton's post-conviction motions

As this court has already noted in discussing the Warden's procedural default argument, the superior court did not address the merits of the claims set forth in Belton's motions for post-conviction relief--aside from his claim that the prosecutor knowingly presented the false testimony of police officers (claim 11A), and two other claims that are not relevant to this order.[20] And this court has already granted summary judgment for the Warden as to a number of these other claims (claims 3-5, 11B). The Warden therefore acknowledges that this court conducts de novo review of the balance of the claims presented for the first time in Belton's post-conviction motions (claims 1, 7-9, 10B-10C, 11C-11E, 12), with one exception:   claim 1, that this "conviction was obtained in violation of [his] Fifth Amendment right against self-incrimination when his coerced confession was used against him at trial."   Rept. & Rec. at 5.   The Warden urges the AEDPA standard of review as to this claim because "the issues

---

[20]   One of these claims became part of Belton's ineffective assistance of counsel theory (claims 2B-2J), as to which the court has already denied the Warden's motion for summary judgment; the other was the claim that the trial judge improperly communicated with the jury (claim 10A), as to which the court has already granted summary judgment for the Warden.

underlying [it] were decided by the state [supreme] court when it rejected Belton's related claim that his confession was the fruit of an unlawful detention."

As this argument suggests, however, the "claim that was adjudicated on the merits" in the state supreme court was not that Belton's confession was inadmissible as the product of coercive interrogation in violation of the Fifth Amendment, but as the product of an illegal arrest in violation of the Fourth Amendment.  "[A] petition is subject to AEDPA's standards of review only when a petitioner has had <u>his</u> claim reviewed by a state court.  If a court considers another claim, it has not considered <u>his</u> claim."  <u>Muth v. Frank</u>, 412 F.3d 808, 815 n.5 (7th Cir. 2005).  This holds true even where, as here, some of the issues underlying the claim decided by the state court are "relevant to" the claim presented on habeas.  <u>See</u> <u>Appel v. Horn</u>, 250 F.3d 203, 211 (3d Cir. 2001) (concluding that state court did not adjudicate petitioner's claim of constructive denial of counsel by ruling that he had not received ineffective assistance of counsel, even though both arose out of counsel's failure to investigate).  This court must review claim 1--like the rest of the claims presented in Belton's post-conviction motions not decided on the merits--under a de novo standard.[21]

_____

[21]   The Warden also suggests that the superior court, in denying Belton's pre-trial motion to suppress his confession, decided the merits of his Fifth Amendment claim.  Though the

**Claim 1:  Belton's confession**

The use of a defendant's involuntary confession against him at trial violates the Fifth Amendment protection against self-incrimination.  <u>Missouri v. Seibert</u>, 542 U.S. 600, 607 (2004). To implement this protection effectively, the Supreme Court in <u>Miranda</u> "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights:  failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."  <u>Id.</u> at 608 (footnote omitted). "Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility."  <u>Id.</u>

Here, the superior court found, <u>Suppression Order</u> at 13-14, and the New Hampshire Supreme Court agreed, <u>Direct Appeal Opinion</u>, 150 N.H. at 748, that Belton had been advised of, and waived, his <u>Miranda</u> rights before confessing to Sambataro on the day after the robbery.  Belton marshals a number of facts that, as he sees it, cast doubt on this finding, e.g., that he had previously refused to cooperate fully, that the police failed to

---

superior court did rule that Belton's confession was voluntary, <u>Suppression Order</u> at 15-16, it did so in the context of rejecting Belton's Fourth Amendment claim that "even if [he] lawfully waived his <u>Miranda</u> rights and made incriminating statements . . . those statements should be suppressed as a result of the unlawful detention of the defendant the day before at his home," <u>id.</u> at 14-15.  Like the supreme court's similar analysis, this Fourth Amendment ruling does not amount to adjudication of Belton's Fifth Amendment claim under AEDPA.  <u>See</u> <u>Appel</u>, 250 F.3d at 211.

document his request to speak to Sambataro, and that the time and place of Belton's arrest was never entered into the form used to indicate the waiver of his <u>Miranda</u> rights.  This weak inferential proof, however, does not approach the clear and convincing evidence necessary to overcome the state courts' finding.  <u>See, e.g.</u>, <u>Desrosier v. Bissonnette</u>, 502 F.3d 38, 43 (1st Cir. 2007).

Belton also points out that, the day prior to his confession, the police subjected him to custodial interrogation without the benefit of <u>Miranda</u> warnings.  A confession given after <u>Miranda</u> warnings can still be involuntary for Fifth Amendment purposes if the warnings themselves were given only after the suspect had already been subjected to custodial interrogation--at least in certain circumstances.  <u>Seibert</u>, 542 U.S. at 611-12.  But the Supreme Court in <u>Seibert</u>[22] could not reach majority agreement as to what those circumstances are.  <u>Id.</u> at 621-22 (Kennedy, J., concurring in judgment).  Justice Souter, writing for a four-member plurality of the Court, identified

> a series of relevant facts that bear on whether <u>Miranda</u> warnings delivered midstream could be

---

[22]  The Supreme Court decided <u>Seibert</u> on June 28, 2004, before it denied Belton's certiorari petition from the affirmance of his conviction on direct appeal on December 6, 2004.  This court need not decide whether <u>Seibert</u> applies retroactively on collateral review, because the case had already been decided when Belton's conviction became "final" for retroactivity purposes, i.e., when his petition for certiorari was denied.  <u>See</u> <u>Kater v. Maloney</u>, 459 F.3d 56, 66 n.8 (1st Cir. 2006) (quoting <u>Caspari v. Bohlen</u>, 510 U.S. 383, 390 (1994)), <u>cert. denied sub nom.</u> <u>Kater v. Dennehy</u>, 127 S. Ct. 2036 (2007).

> effective enough to accomplish their object:  the
> completeness and detail of the questions and
> answers in the first round of interrogation, the
> overlapping content of the two statements, the
> timing and setting of the first and the second,
> the continuity of police personnel, and the degree
> to which the interrogator's questions treated the
> second round as continuous with the first.

Id. at 615.  Believing that "this test cuts too broadly,"

however, Justice Kennedy settled on "a narrower test, applicable

only in the infrequent case, such as we have here, in which the

two-step interrogation technique was used in a calculated way to

undermine the [eventual] Miranda warning," and therefore

concurred only in the majority's judgment that the confession was

involuntary despite the "midstream" Miranda warning.  Id. at 622.

The majority of circuits have followed Justice Kennedy's

concurrence, holding that Seibert applies only to "cases in which

a deliberate, two-step strategy was used by law enforcement to

obtain the postwarning confession." United States v. Carter, 489

F.3d 528, 535 (2d Cir. 2007) (collecting cases), cert. denied sub

nom. Bearam v. United States, 128 S. Ct. 1066 (2008).  The First

Circuit's approach is less clear.

In United States v. Materas, 483 F.3d 27 (1st Cir. 2007),

the First Circuit upheld this court's denial of a motion to

suppress a confession in the absence of evidence "that the police

were attempting to undermine the purposes of the Miranda rule to

gain subsequent Mirandized confessions." Id. at 33 (citing

Seibert, 542 U.S. 600).  But it also relied on this court's

39

finding that "the first questioning was not at all systematic or extensive," citing approvingly to the _Seibert_ plurality's discussion of "a number of factors related to the effectiveness of _Miranda_ warnings." _Id._ (internal quotation marks omitted). And the _Materas_ court did not acknowledge the other circuits' tendency to follow Justice Kennedy's opinion in _Seibert_, or, for that matter, its lack of a majority opinion in the first place. _See_ _id._  This court need not try to divine the First Circuit's view of _Siebert_, however, because Belton's confession was voluntary under either the plurality's or Justice Kennedy's test. _See_ _United States v. Carrizales-Toledo_, 454 F.3d 1142, 1151 (10th Cir.) (avoiding question of which _Seibert_ opinion controls because defendant's claim failed under both), _cert. denied_, 127 S. Ct. 692 (2006); _United States v. Horton_, 490 F. Supp. 2d 1161, 1168 (D. Kan. 2007) (same).

Belton's initial interrogation, on the day of the robbery, was brief in duration and limited in scope.  The police focused their questions almost exclusively on his claim that he had been out jogging when the bank was robbed, departing from this subject only to confront him with the clothing that had been discovered along the robber's escape route.  Belton, for his part, simply stuck to his story until he announced his refusal to incriminate himself, terminating the session.  Indeed, apart from that

protestation, Belton did not say anything to the police that day which could even arguably be considered inculpatory.[23]

The near-complete lack of self-incriminatory statements during the first interrogation strongly suggests that the <u>Miranda</u> warnings given before the second interrogation had their intended effect.  In this context, "the <u>Miranda</u> warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission," because Belton's "earlier admission" did almost nothing to further the case against him.  <u>Seibert</u>, 542 U.S. at 615-16 (finding warning ineffective where "there was little, if anything, of incriminating potential left unsaid" during pre-warning interrogation).  It would have been unlikely, then, for a reasonable person in Belton's position "to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before."  <u>Id.</u> at 617.  Virtually nothing had been "said before."  So there is no reason to think that Belton's earlier conversation with the police jeopardized "the comprehensibility and efficacy of the <u>Miranda</u> warnings" under <u>Seibert</u>.   <u>Id.</u>

The <u>Seibert</u> plurality's factors confirm this.  First, as just discussed, the prior interrogation covered little ground.

---

[23]  Belton did comment that the bank tellers could not identify the robber because he had been wearing a mask, which was not yet public information at that point; he soon added, however, that he had heard that fact broadcast over the police radio.

Second, and relatedly, its content did not overlap to any meaningful degree with that of the subsequent interrogation: while the discovery of the robber's clothing figured in both sessions, the later one also touched upon DNA evidence, eyewitnesses, and, most of all, the fate of the stolen money. Third, while both interrogations took place at the police station and involved Detective Sambataro, these similarities are largely superficial, because almost twenty-four hours had passed between them, and, during that span, Belton had been released from custody, re-arrested, and appeared before a judge with counsel. Fourth, Sambataro did not treat the second round of questioning as a continuation of the first; there is no indication that he even reminded Belton that they had spoken previously, which would make sense given that Belton had so little to say the first go-round. Cf. Seibert, 542 U.S. at 616 (finding Miranda warnings ineffective where "impression that the further questioning was a mere continuation of the [pre-warning] questions and responses was fostered by references back to the confession already given"). Under these circumstances, that the police initially interrogated Belton without giving him Miranda warnings does not invalidate his subsequent "Mirandized" confession. See Carrizales-Toledo, 454 F.3d at 1152 (applying Seibert plurality test to similar facts to reach same conclusion).

42

Applying Justice Kennedy's test produces the same result. There is simply no indication that a "two-step interrogation technique was used in a calculated way to undermine the <u>Miranda</u> warning." <u>Seibert</u>, 524 U.S. at 622. Though, as Belton emphasizes, the police did subject him to custodial interrogation without the benefit of <u>Miranda</u> warnings, they terminated that session by immediately releasing him upon his request. This suggests, as the officers explained at the suppression hearing, that they did not advise Belton of his <u>Miranda</u> rights because they did not believe he was in custody, rather than "to obscure both the practical and legal significance of the warning." <u>Id.</u> at 620; <u>see also</u> <u>Carrizales-Toledo</u>, 454 F.3d at 1153 (finding no illegal two-step interrogation where initial failure to "Mirandize" likely resulted from confusion as to whether defendant was in custody). What the police did next--re-arresting Belton, in Massachusetts--served only to provide a tonic for any hangover from the unwarned interrogation, ensuring that he would appear before a judge, with counsel, for extradition proceedings that could delay his return to their jurisdiction. And, again, after Belton specifically asked to talk to Sambataro, he responded with a detailed recitation of <u>Miranda</u>'s protections, followed by an interview in which the previous interrogation was, so far as it appears, not even mentioned. The totality of the police conduct here bears not

43

even the slightest resemblance to the "infrequent case" of
Miranda manipulation envisioned by Justice Kennedy.  Belton
received effective Miranda warnings before confessing,
notwithstanding his earlier unwarned interrogation.  See, e.g.,
Carter, 489 F.3d at 536 (concluding that police did not employ
improper two-step interrogation strategy where only one question
was asked on incriminating subject during first interrogation).

Finally, the possibility remains that Belton nevertheless
confessed involuntarily, though "[c]ases in which a defendant can
make a colorable argument that a self-incriminating statement was
compelled despite the fact that the law enforcement authorities
adhered to the dictates of Miranda are rare."  Berkemer v.
McCarty, 468 U.S. 420, 433 n.20 (1984).  Belton cannot.  Though
he complains that Sambataro coerced the confession by falsely
claiming to have DNA evidence implicating him and falsely
promising to inform the prosecutor that he had cooperated,[24]
neither of these charges can sustain a Fifth Amendment claim.

"[T]rickery is not automatically coercion.  Indeed, the
police commonly engage in such ruses as suggesting . . . that
police have or will secure physical evidence against the
suspect."  United States v. Byram, 145 F.3d 405, 408 (1st Cir.

---

[24]  Belton also alludes to alleged questioning at the hands
of Sambataro and the federal agent following Belton's arraignment
on the robbery charge.  But even if this questioning occurred--
which Sambataro has denied--Belton had already confessed at that
point, so it has no relevance to the voluntariness inquiry.

1998).  Similarly, "[t]he mere fact that an unfulfilled promise
was made in exchange for a person's statement does not constitute
coercion," as in the case of false assurances of leniency.
United States v. Flemmi, 225 F.3d 78, 91 (1st Cir. 2000).  Though
"the line between ruse and coercion is sometimes blurred," Byram,
145 F.3d at 408, there is no doubt as to which side of the line
this case falls.

        After Belton specifically asked to talk to Sambataro,
specifically asked him what proof the police had, then
specifically asked him about negotiating a deal with the
prosecution, Sambataro responded with a largely accurate account,
duplicitous only in its reference to DNA evidence on the
discovered clothing and, perhaps, the accompanying suggestion of
leniency.  These details, purposefully inaccurate as they may
have been, cannot be treated as coercion, particularly in light
of the surrounding circumstances just mentioned.  See Moran v.
Burbine, 475 U.S. 412, 422 (1986) (ruling that defendant had
voluntarily confessed where he, "and not the police, . . .
spontaneously initiated the conversation that led to the . . .
confession").  When the record is viewed in the light most
favorable to Belton, the Warden is entitled on summary judgment
on claim 1 of the petition.

**Claim 7:  Pretrial identification procedures**

"Pretrial identification evidence is subject to constitutional limitations under the Due Process Clause."  United States v. Lopez-Lopez, 282 F.3d 1, 10 (1st Cir. 2002) (citing Stovall v. Denno, 388 U.S. 293, 298-99 (1967)).  Determining whether the admission of identification evidence at trial violates due process entails a two-step inquiry.  United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003).  First, the court must decide whether the police used an impermissibly suggestive identification procedure; second, if so, the court must decide whether the resulting identification was nevertheless reliable under the totality of the circumstances.  Id.  Here, because the procedure was not unduly suggestive, the court need not reach the question of the reliability of the identifications.  See United States v. Maguire, 918 F.2d 254, 265 (1st Cir. 1990).

As previously noted, the state introduced testimony at trial that Arsenault and Coker, who had witnessed the robber's flight from the bank, identified Belton as the perpetrator by choosing his picture from a photo array.  Belton argues that these identifications resulted from an impermissibly suggestive procedure because, first, the police used a photograph of him in a jacket similar to the robber's while the others in the array were dissimilarly attired, and, second, the procedure did not take place until after Belton's photograph had already appeared

46

in the newspaper story about the robbery which identified him as the suspect.  These arguments are without merit.

In assessing the suggestiveness of photographic identification procedures, courts have considered a number of factors, including the similarity in appearance of those depicted in the array, the number of photographs used, and the extent to which the arrangement or other conduct by police emphasizes the defendant's photograph.  See, e.g., United States v. Flores, 149 F.3d 1272, 1279 (10th Cir. 1998); 2 Wayne R. LaFave et al., Criminal Procedure § 7.4(e), at 680-83 (2d ed. 1999).  Here, the array shown to Arsenault and Coker consisted of eight photographs in mug shot format, all depicting males of around the same age and build who appear to be African-American.  All but one has a mustache or at least some hint of facial hair, and all but one wears dark-colored clothing.  Belton is neither the lone clean-shaven man nor the lone brightly-attired one and, though he is one of only two men with a shaved head, all the others have closely cropped hair to one degree or another.

So, while Belton alone wears clothing with stripes on the shoulders, that feature hardly stands out among the sea of similarity otherwise presented by the array.  See, e.g., Flores, 149 F.3d at 1278-79 (rejecting claim of unduly suggestive array where "photographs were all of Hispanic males of roughly similar build, height, age, and hairstyles," even though only defendant

47

wore goatee).  Moreover, because neither Arsenault nor Coker
reported that the robber wore a striped jacket, "it is irrelevant
that [Belton] is the only one pictured wearing one."  <u>United
States v. Brennick</u>, 405 F.3d 96, 100 (1st Cir. 2005) (denying
claim of unduly suggestive array even though defendant wore
particular clothing in photograph, because witnesses had not
described seeing suspect in that clothing); <u>see also</u> <u>Maguire</u>, 918
F.2d at 265 (collecting cases rejecting challenges to arrays
founded on unique aspects of defendant's hairstyle or jewelry).

There is likewise no evidence that either Arsenault or Coker
had seen Belton's picture in the newspaper prior to seeing the
array, or that the police said or did anything as part of the
identification process to nudge the witnesses in the direction of
Belton's photograph.  Accordingly, there is no way that the
"photographic identification procedure was so impermissibly
suggestive as to give rise to a very substantial likelihood of
irreparable misidentification."  <u>Simmons v. United States</u>, 390
U.S. 377, 383 (1968).  When the record is viewed in the light
most favorable to Belton, the Warden is entitled on summary
judgment on claim 7 of the petition.

### Claim 8:  Race-based investigation and prosecution

Belton's petition includes a claim that his "conviction
violated [his] Fourteenth Amendment right to equal protection of

the laws when prosecutorial and investigatory decisions were made on the basis of race," identified as claim 8.  Rept. & Rec. at 7. In his memorandum in response to the Warden's initial motion for summary judgment, however, Belton "asserts claim 8 is waived for purposes of adjudication," and says nothing more about it, either in that filing or his subsequent response to the Warden's second summary judgment motion.  Given this affirmative act of waiver, summary judgment in the Warden's favor on claim 8 is appropriate without further analysis.[25]  See Caouette v. OfficeMax, Inc., 352 F. Supp. 2d 134, 140 (D.N.H. 2005) (granting summary judgment for defendant on age-based termination claim where plaintiff admitted in response that he had not been fired due to age).

## Claim 9:  Effect of the dismissal of the federal charge

Belton argues that his conviction on the state bank robbery charge, following the dismissal of the federal charge for the same crime in this court, offends principles of res judicata and double jeopardy.  But this court's pre-trial dismissal of the federal charge implicates neither of these doctrines.[26]  Only

---

[25]  In any event, the court sees nothing in the record that could possibly support this claim.

[26]  Belton's brief in support of his petition, but not his responses to the Warden's motions for summary judgment, also invokes full faith and credit principles.  These principles, however, dictate the effect of state judgments, not federal ones. See Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 506-07 (2001).

final judgments have res judicata effect, and even then, only as to the parties or their privies.  See, e.g., G. & C. Merriam Co. v. Saalfield, 241 U.S. 22, 28 (1916).  This court's disposition of the charge against Belton–by granting the government's motion to dismiss without prejudice--is not a "final judgment" for res judicata purposes.  See, e.g., Lombard v. United States, 194 F.3d 305, 312 (1st Cir. 1999).  In any event, the federal proceeding was initiated by a different prosecutorial sovereign (the United States) than the one that eventually secured the conviction against Belton (the State of New Hampshire).  "It is clear that state and federal governments are separate parties for res judicata purposes . . . .  [A] state is free to prosecute in the wake of a federal prosecution."[27]  18A Charles Alan Wright et al., Federal Practice & Procedure § 4458, at 552-54 (2d ed. 2002) (footnote omitted).

Belton's double jeopardy claim fails for the same reasons. The Fifth Amendment's prohibition on double jeopardy does not bar successive prosecutions for the same offense in both state and federal court, because the state and federal governments are different sovereigns, each with the independent power to punish violations of its own laws.  United States v. Lanza, 260 U.S.

---

[27]  Courts have recognized an exception to this rule where "state prosecutors had participated actively in the federal prosecution."  Stephens v. Att'y Gen., 23 F.3d 248, 249 (9th Cir. 1994).  There is no evidence to that effect here.

377, 382 (1922).  Furthermore, jeopardy does not attach to a prosecution until the jury is empaneled and sworn.  <u>Crist v. Bretz</u>, 437 U.S. 28, 34 (1978).  This court's pre-trial dismissal of the government's charge against Belton, then, had no effect for double jeopardy purposes.  Even a full acquittal would not have prevented New Hampshire, a different sovereign, from prosecuting him for the same thing.  It makes no difference that the Assistant United States Attorney secured dismissal of the federal charge out of a stated concern for the admissibility of Belton's confession.  When the record is viewed in the light most favorable to Belton, the Warden is entitled on summary judgment on claim 9 of the petition.

### Claims 10B and 10C:  Judicial misconduct

Belton argues that, because the superior court judge demonstrated bias against him, he was deprived of his right to a fair trial.  "[T]he Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case."  <u>Bracy v. Gramley</u>, 520 U.S. 899, 904-05 (1997) (internal quotation marks and citation omitted).  Though a trial judge's comments can suffice to show such bias, "a finding of partiality should be reached only from an abiding impression left from a reading of the entire record, and need not be reached on

51

the basis of a few improper comments." United States v. Twomey, 806 F.2d 1136, 1140 (1st Cir. 1986) (internal quotation marks and citation omitted); see also, e.g., United States v. Rodriquez-Rivera, 473 F.3d 21, 27 (1st Cir. 2007).

Here, Belton founds his claim of bias on just one comment:[28] the judge's arguable expression of insensitivity to the medical condition of Belton's mother, see note 5, supra. That comment, taken in its immediate context, does not fairly suggest bias against Belton, but, even if it did, it could not possibly sustain a constitutional claim, given the absence of other indicia of bias during the balance of the proceedings. See, e.g., United States v. Balthazard, 360 F.3d 309, 319 (1st Cir. 2004) (ruling that judge's "relatively mild" admonishment to defense counsel on a single occasion did not show bias). The comment, moreover, did not occur in the presence of the jury or even at trial, for that matter, but at a hearing on the suppression motions that occurred nearly a year beforehand. The First Circuit has repeatedly held that a judge's comments outside the jury's earshot generally cannot establish bias. See Rodriquez-Rivera, 473 F.3d at 28 (citing cases).

---

[28] As previously noted, Belton had argued that the judge told the jury, after entering the jury room during their deliberations, of Belton's prior robbery convictions, but this court has already entered summary judgment for the Warden on this claim given the lack of any clear evidence to support it.

Belton also alleges that the judge "would periodically fall asleep" during the suppression hearing.  But there is no evidence for this claim and, as the Warden points out, the transcript of the suppression hearing suggests that the judge actively participated in it.  Belton attributes his lack of evidence to the state's failure to maintain videotapes taken of the hearing, despite his post-conviction motion to preserve those tapes and other claimed exculpatory evidence.  While a party can argue for a negative inference based on his adversary's destruction of relevant evidence, that inference is appropriate only if the adversary knows of both the claim and the relevance of the evidence to it before the destruction occurs.  <u>Testa v. Wal-Mart Stores, Inc.</u>, 144 F.3d 173, 177 (1st Cir. 1998).  Belton did not file his motion to preserve the videotapes, or otherwise assert their relevance to his claims for post-conviction relief, until nearly three years after the tapes were made.  Given this substantial passage of time, there is no reason to think the state knew of the importance of the videotapes upon their destruction (whenever that happened--the record is silent on this point as well).  When the record is viewed in the light most favorable to Belton, the Warden is entitled on summary judgment on claims 10B and 10C of the petition.

**<u>Claims 11C - 11E:  Prosecutorial misconduct</u>**[29]

Claim 11C of Belton's petition, as construed by the magistrate judge, asserts that the prosecution violated Belton's due process rights when it "offered the testimony of a color-blind witness without providing proper exculpatory information." Rept. & Rec. at 8.  Belton acknowledges, however, that his counsel received a law enforcement report referencing Arsenault's color-blindness in advance of trial.  <u>See</u> note 6, <u>supra</u>.  But he now advances a different theory, arguing that his claim regarding Arsenault's color-blindness "centered on the introduction of the evidence without informing the jury" of his disability.  Belton cannot switch horses in midstream.  As the magistrate cautioned, Rept. & Rec. at 11-12, the failure to object to a magistrate's Report and Recommendation "irretrievably waives any right to review by the district court."  <u>Santiago v. Canon U.S.A., Inc.</u>, 138 F.3d 1, 4 (1st Cir. 1998) (refusing to consider theory different from that presented to magistrate judge).  Regardless, the court is not aware of any authority requiring the prosecution to question its own witnesses on every possible detail that might go to the weight of their testimony, particularly when those

---

[29]  This court has already granted summary judgment to the Warden on claim 11B.  Claim 11A, which was adjudicated on the merits by the superior court, is discussed <u>infra</u>.

details have already been disclosed to the defendant.[30]  When the record is viewed in the light most favorable to Belton, the Warden is entitled on summary judgment on claim 11C.

Claim 11E suffers from the same deficiencies.  The magistrate judge construed it as asserting "vindictive prosecution by increasing the severity of the charges when Belton exercised his constitutional rights in the defense of his case," Rept. & Rec. at 8.  But the severity of the charge remained the same during the entirety of the case, so this theory plainly has no merit.  Though Belton did not object to the Report and Recommendation, he now argues that claim 11E incorporates a theory that the state failed to preserve exculpatory evidence, namely, a sample taken from a red substance discovered in the bank parking lot, as well as Sambataro's notes of Belton's confession.  Again, Belton cannot now proceed on claims he did not raise before the magistrate judge.  See Santiago, 138 F.3d at 4.  In any event, there is no basis to conclude that the alleged exculpatory evidence would have aided his defense.

Even if the red substance were from an exploding dye pack--a point on which the record is equivocal, at best--Belton makes no

---

[30]  For example, most prosecutors believe that sound advocacy militates the "bringing out on direct examination" of credibility-weakening information, such as a plea agreement with the prosecution calling for leniency at the witness's sentencing in exchange for cooperation and truthful testimony.  It does not follow from this, however, that a prosecutor's failure to follow this time-honored practice amounts to a Constitutional violation.

attempt to explain how that fact would have made it less likely
that he had robbed the bank.  As to Sambataro's notes, he
testified that, per his standard procedure, he destroyed them
when he incorporated their substance into his report, and Belton
offers nothing more than speculation that the notes differed from
the report in any way material to his defense.  Indeed, Belton
acknowledges that his "entire defense depended on police
misconduct."  The destruction of these items--a point on which
his counsel extensively cross-examined both witnesses--provided
more support for his case, for all that appears, than their
preservation would have.  When the record is viewed in the light
most favorable to Belton, the Warden is entitled on summary
judgment on claim 11E.

In claim 11D, Belton asserts that the prosecutor made
improper remarks to the jury when he argued in summation that
Belton's actions after the robbery were consistent with an
attempt to create an alibi.  This was not improper summation.  A
prosecutor is free to urge the jury to draw inferences reasonably
supported by the evidence admitted at trial.  See, e.g., United
States v. Ortiz, 447 F.3d 28, 35 (1st Cir. 2006); United States
v. Lore, 430 F.3d 190, 211 (3d Cir. 2005) ("The prosecution may
ask the jury to draw permissible inferences from anything that
appears in the record.") (internal bracketing and quotation marks
omitted).  Belton's evidence consisted largely of witnesses who

reported interacting with him on the morning of the robbery;
defense counsel argued in her closing that these interactions did
not fit the picture of a man who had just robbed a bank.  The
prosecutor was free to offer a different, more culpable, view of
that behavior, regardless of whether Belton had formally raised
an alibi defense at trial.  Belton cites no authority for the
proposition that a prosecutor's ability to argue against an alibi
is dependent on a formal notice of the defense under Fed. R.
Crim. P. 12.1.  When the record is viewed in the light most
favorable to Belton, the Warden is entitled on summary judgment
on claim 11D of the petition.

### Claim 12:  Confrontation Clause violation

Belton claims that his Sixth Amendment right to confront the
witnesses against him was abridged when Peddle testified to
Guptil's statement that he had seen a black man, wearing a blue
jacket, white sneakers, and blue jeans, running toward Methuen in
the wake of the robbery.  In response, the Warden argues, among
other things, that Guptil's declaration did not implicate the
Confrontation Clause because it was not testimonial.  See
Crawford v. Washington, 541 U.S. 36, 50-53 (2004).[31]  A witness's

---

[31]Though Crawford has no retroactive application to cases on
collateral review, Whorton v. Bockting, 127 S. Ct. 1173, 1184
(2007), Belton's case was still on direct review at the time
Crawford was decided, on March 8, 2004.  See note 22, supra.

statement to police, as the Warden points out, is not testimonial
when its circumstances "objectively indicate its primary purpose
was to enable police assistance to meet an ongoing emergency."
Davis v. Washington, 126 S. Ct. 2266, 2277 (2006).

Drawing on Davis, the First Circuit has identified a number
of factors bearing on whether a declarant's out-of-court
statement evinces such a purpose, including:

> (1)  Was the declarant speaking about current events as
>      they were actually happening, 'requiring police
>      assistance,' rather than describing past events?
>
> (2)  Would a 'reasonable listener' conclude that the
>      declarant was facing an ongoing emergency that
>      called for help?
>
> (3)  Was the nature of what was asked and answered . .
>      . [indicate] that, 'viewed objectively, the
>      elicited statements were necessary to resolve the
>      present emergency, rather than 'simply to learn .
>      . . what had happened in the past?'
>
> (4)  What was the level of formality of the interview?

United States v. Cadieux, 500 F.3d 37, 41 (1st Cir. 2007)
(quoting Davis, 126 S. Ct. at 2276-77), cert. denied, 128 S. Ct.
1226 (2008).  Each of these factors suggests that Guptil's
statement served principally "to enable police assistance to meet
an ongoing emergency" and therefore was not testimonial under the
Confrontation Clause.  Davis, 126 S. Ct. at 2277.

Peddle, who was on patrol in a cruiser when the robbery was
reported, responded by driving around the vicinity of the bank
looking for the perpetrator--who was considered armed based on

58

the threats he made during the hold-up.  After spotting a man running along the railroad tracks in the direction of Methuen, Peddle drove on to a roadway bridge crossing over them in the hope of intercepting the suspect.  There, Peddle came across Guptil, whom he asked whether he had seen anyone in the area and, when Guptil said he had, what the person looked like.  Peddle then continued driving in the direction that Guptil indicated the suspect had run, still intending to cut him off.

The nature of this interaction unquestionably shows an exchange intended, from the perspective of both parties, to catch a fleeing suspect in a violent crime.  Under Davis, then, Guptil's declarations were not testimonial.  See United States v. Clemmons, 461 F.3d 1057, 1060-61 (8th Cir. 2006) (finding victim's statements identifying defendant to officer who immediately responded to reports of shooting to be nontestimonial where "the purpose of the interrogation was to enable police assistance to meet that emergency").

Furthermore, even if the statements could be considered testimonial, and their admission a violation of the Confrontation Clause, the violation would not justify habeas relief.  In cases of constitutional trial error, "[a] federal habeas court is bound to uphold a state court judgment as long as the error did not have a 'substantial, injurious effect on the jury's verdict.'" Petrillo v. O'Neill, 428 F.3d 41, 44-45 (1st Cir. 2005) (quoting

Sanna v. Dipaolo, 265 F.3d 1, 14 (1st Cir. 2001)), cert. denied
sub nom. Petrilli v. Murphy, 547 U.S. 1117 (2006).  The mountain
of evidence against Belton--consisting of his confession, DNA
linking him to the mask worn by the robber, and the
identification testimony of a number of witnesses--simply dwarfs
Guptil's statement describing the perpetrator.  So Peddle's
isolated testimony could not have had the prejudicial effect on
the outcome of the trial necessary for habeas relief.  When the
record is viewed in the light most favorable to Belton, the
Warden is entitled on summary judgment on claim 12.


     **C.**    **Claims adjudicated on the merits in state court**

    Aside from his ineffective assistance of counsel claims,
which are not at issue in this order, Belton's remaining claims
were adjudicated on the merits in state court.  Claim 6, which
alleges that the prosecution violated Belton's due process rights
by failing to disclose that Spignesi could not identify the
robber in the photo array, was presented to the superior court,
where Belton argued that the state's shortcoming transgressed
both that court's discovery rules and the Supreme Court's holding
in Brady v. Maryland.  As previously discussed, the superior
court ruled that any such violation had already been cured when
Spignesi herself testified that she had not been able to select
the robber from the array.  Claim 11A alleges that the prosecutor

allowed police witnesses to testify falsely at trial.  The superior court recognized this claim in Belton's motion to amend his new trial motion, but ruled that "it had found nothing in the defendant's pleading that would warrant the scheduling a [*sic*] hearing on [that] issue[]."  New Trial Dec. at 2.

The superior court's rulings, brief as they were, suffice to trigger AEDPA's deferential standard of review.  See Teti v. Bender, 507 F.3d 50, 56-57 (1st Cir. 2007), cert. denied sub nom. Teti v. Clarke, 76 U.S.L.W. 3511 (2008).  That standard "applies regardless of the procedures employed or the decision reached by the state court, as long as a substantive decision was reached." Id. at 57.  Thus, claims 6 and 11A cannot support habeas relief unless the state court's adjudication of them either (1) "was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

### Claim 6:  Failure to disclose Spignesi's identification attempt

Belton argues that the superior court acted in derogation of Brady v. Maryland by denying his request to disallow all of the state's identification evidence because it had not disclosed Spignesi's inability to choose the robber from the array.  Brady

61

requires the prosecution, upon request, to provide material,

exculpatory evidence.  373 U.S. at 87.  But "[t]here is no

general constitutional right to discovery in a criminal case, and

Brady did not create one." Weatherford v. Bursey, 429 U.S. 545,

559 (1977).  So the wrongful denial of discovery does not make

out a Brady violation unless it deprived the defendant of

material, exculpatory evidence.  Rodriquez-Rivera, 473 F.3d at

26.  That did not happen here, because, despite the state's

failure to make pre-trial disclosure of the fact that Spignesi

had not identified the robber in the array, defense counsel

learned of the fact both before trial, as a result of their

independent investigation, and at trial, when Spignesi testified

to that very detail in front of the jury.

     At most, then, the state's failure might give rise to a

claim of delayed disclosure under Brady, i.e., that Belton's

"counsel was prevented by the delay from using the disclosed

material effectively in preparing and presenting the defendant's

case." United States v. Misla-Aldarondo, 478 F.3d 52, 63 (1st

Cir.) (internal quotation marks omitted), cert. denied, 128 S.

Ct. 132 (2007).  To prevail on such a claim, "the defendant must

at a minimum make a prima facie showing of a plausible strategic

option which the delay foreclosed." Id. (internal quotation

marks omitted).  Belton makes no attempt to do so, relying on the

bare assertion that "the undisclosed evidence ha[d] an impact on

[his] ability to prepare for trial especially when it was not known to [him] until the eve of trial."  This is insufficient.

Indeed, it is difficult to imagine how the withheld information could have been used at trial other than to force Spignesi to admit on the stand that she had been unable to identify the robber from the array--which, of course, is exactly what she did.  The superior court's rejection of Belton's <u>Brady</u> claim involved no unreasonable application of clearly established federal law.  <u>See</u> <u>United States v. Collazo-Aponte</u>, 216 F.3d 163, 189 (1st Cir. 2000) (ruling that delayed disclosure of witness's failure to identify defendant in array did not prejudice him when it was revealed in time to allow witness to be questioned about it at trial), <u>vacated on other grounds</u>, 532 U.S. 1036 (2001); <u>United States v. Ayres</u>, 725 F.2d 806, 811 (1st Cir. 1984) (same).  When the record is viewed in the light most favorable to Belton, the Warden is entitled on summary judgment on claim 6.

### Claim 11A:  Alleged police perjury

In support of claim 11A, Belton alleges that the prosecutor allowed Sambataro and Beaudet to testify falsely at trial and Joy to testify falsely at the suppression hearing.  Belton argues that, in rejecting this claim, the superior court disregarded <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), under which "it is established that a conviction obtained through use of false

63

evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Id. at 269.  This argument is misplaced, because Belton has not shown that any of the witnesses in question testified falsely.

As previously discussed, Belton attempts to contrast the testimony each of the officers gave at trial with what they said at the suppression hearing (or, in Joy's case, what he said at the suppression hearing with what he had previously written in a report).  But, in the case of Sambataro and Beaudet, the testimony was consistent.  Sambataro testified at the suppression hearing that, while he and the federal agent did not jointly try to interview Belton on the day of his initial arraignment in state court, the agent "may have" done so on her own; at trial, he testified simply that Sambataro had sought an introduction to Belton and given him her business card.  Beaudet, for his part, testified at the suppression hearing that he did not know whether a certain newspaper had taken a photograph of Belton in custody. Beaudet then testified at trial that he was "aware" that the paper ran Belton's picture the day after the robbery, but was neither asked nor offered when he became aware of that fact--so it could have been when he was shown the newspaper at the suppression hearing.  The alleged inconsistencies in the testimony, then, "fall far short of showing that the witnesses in question perjured themselves, much less that the [state]

knowingly allowed them to do so." <u>United States v. Casas</u>, 425
F.3d 23, 45 (1st Cir. 2005); <u>see also</u> <u>United States v. Myers</u>, 294
F.3d 203, 209-10 (1st Cir. 2002) (ruling that "some
inconsistencies in the testimony of various police officers" did
not amount to "knowing use of perjurious testimony").

The perjury claim directed at Joy is even weaker:  it arises
from testimony he gave that was inconsistent with a report he had
prepared earlier.[32]  Specifically, Joy had written in the report
that, prior to tracking the robber with the dog, he had not
communicated with any other police officer about the suspect's
possible escape route.  But Joy had testified to precisely those
kinds of communications on direct examination at the hearing,
giving defense counsel a perfect opportunity to use the report to
impeach him.  This impeachment eventually resulted in Joy's
concession that, contrary to the report, fellow officers had in
fact given him some information about where the suspect had been
spotted prior to the start of the dog tracking efforts.  When a
prosecution witness gives testimony acknowledging inaccuracies in
his prior statements, the result is a triumph of the truth-
finding function of cross-examination, not a due process problem.

---

[32]  In addition, this claim arises out of Joy's testimony at
the suppression hearing, not the trial, and the magistrate judge
construed claim 11A as limited to the presentation of "perjured
police testimony <u>to the jury</u>."  Rept. & Rec. at 8 (emphasis
added).  As previously discussed, Belton cannot proceed on claims
the magistrate judge did not recognize without having objected to
the Report and Recommendation.

See Casas, 425 F.3d at 45 (noting that conflicts among testimony
of prosecution witnesses "are a matter to be explored on cross-
examination," not a Napue violation); United States v. Brand, 80
F.3d 560, 566 (1st Cir. 1996).

The superior court did not unreasonably apply Napue (or any
other clearly established federal law) when it rejected Belton's
police perjury claim.  When the record is viewed in the light
most favorable to Belton, the Warden is entitled on summary
judgment on claim 11A of the petition.


**CONCLUSION**

For the foregoing reasons, the Warden's supplemental motion
for summary judgment (document no. 40) is GRANTED as to claims 1,
6-9, 10B-10C, 11A, 11B-11D, and 12 of Belton's petition.  The
Warden's initial summary judgment motion (document no. 31) was
already granted as to claims 2A, 3-5, 10A, and 11B, and denied as
to claims 2B-J, and a hearing granted and counsel ordered to be
appointed as to those remaining claims.  This court shall
forthwith issue a separate order regarding the appointment of
counsel and the conduct of the hearing.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge


66

April 2, 2008

cc:  Allen T. Belton, pro se
     Susan P. McGinnis, Esq.